UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MICHAEL SNOW,

       Plaintiff,

v.                             CASE NO.: 2:04-cv-00515-VMC-SPC

DIRECTV, INC., a California Corporation;
STUMP, STOREY, CALLAHAN,
DIETRICH & SPEARS, P.A., a Florida
Professional Association; YARMUTH,
WILSDON & CALFO, PLLC, a
Washington Professional Limited Liability
Company; and JOHN DOES 1-25,

       Defendants.

_____/

**JOINT MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# I.   INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Michael Snow, a previous defendant in an anti-piracy action brought by DIRECTV in this court, initiated this case against DIRECTV, and two of its outside counsel, Yarmuth Wilsdon Calfo PLLC and Stump, Storey, Callahan, Dietrich & Spears, P.A. (collectively, "Defendants"), alleging breaches of the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*   This lawsuit appears to be the latest development in a series of threats, non-meritorious filings, and sanctionable conduct that has characterized Snow's sworn "campaign to fight the evil devil DIRECTV,"[1] which apparently began after he was sued by DIRECTV.[2] Unwilling to participate in the civil discovery process in the prior action, Snow resorted to bribery, offering a DIRECTV employee $2,500 to release confidential information to him.  This conduct led to a sanction of $600, imposed by Magistrate Judge Chapell, on August 3, 2004.[3] Ultimately, despite Snow's repeated improper conduct,[4] DIRECTV dismissed the underlying case against Snow without prejudice and, as part of that dismissal, agreed to forego the recovery of sanctions.

Apparently dissatisfied with the absence of ongoing litigation between himself and DIRECTV, Snow filed the instant action, which he styles as one for "e-trespass."  In it, Snow

---

[1]   In his deposition in the prior action, Mr. Snow was asked whether he was employed; he responded "No.... Excuse me, actually I'm employed.  I am in a campaign to fight the evil devil DIRECTV." (June 23, 2004 Dep. of Mike Snow ("Snow Dep.") at 15 (excerpts attached hereto as Ex. A.).)

[2]   To date, Snow has threatened to sue DIRECTV and certain individual lawyers for malicious prosecution (*Id.* at 17), copyright infringement (*Id.* at 43), frivolous lawsuits and false accusations (*Id.* at 57), extortion (*Id.* at 65, 79), and other unspecified claims. (*Id.* at 67-68.)  He has also testified to assisting thousands of other individuals involved in litigation with DIRECTV. (*Id.* at 73.)

[3]   *See* May 19, 2004 Court Order issued in *DIRECTV, Inc. v. Mike Snow*, No. 2:03-CV-394-FTM-29SPC (attached hereto as Ex. B).

[4]   *Id.* at 2 ("This is the third time the court has found it necessary to address Snow's abuse of the judicial system.").

alleges that Defendants committed an "e-trespass" by visiting his publicly accessible website which contained Terms of Use prohibiting access to representatives, agents, suppliers or relatives of "DIRECTV, Dish Network, RIAA or any other Corporation seeking to sue individuals for alleged pirate acts." (Compl. ¶ 16.) In asserting a violation of the Stored Communications Act, 18 U.S.C. § 2701 ("SCA" or "the Act"), Snow improperly invokes a criminal statute designed to punish hackers who break into Internet Service Providers networks to steal private emails. Snow's claim appears to be that a website owner has the absolute right to condition admission to a publicly-accessible website on any contractual terms he wishes, thereby making the violation of any terms into a criminal act. If he chooses to exclude left-handed people on even numbered days, and right-handed people on odd number days, a lefty visiting the site on December 18 would be guilty of a federal felony. The laws related to electronic communications and Internet activity, however, do not provide Snow such authority.

Criminal liability under the SCA is reserved for a narrowly circumscribed class of computer hacking violations, and does not encompass the type of "e-trespass" Snow alleges. Instead, the gist of Snow's claim is known in the law as Trespass to Chattels. Courts addressing such claims have consistently held that a plaintiff must show some physical damage to the computer or interference with its use, resulting from the violation of the terms of use.[5] These holdings follow the principles set forth in section 218 of the Restatement Second of Torts:

> "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless

---

[5] *See, e.g., Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1360 (2003) ("Intel has not presented undisputed facts demonstrating an injury to its personal property, or to its legal interest in that property, that support, under California tort law, an action for trespass to chattels."); *Hotmail Corp. v. Van$ Money Pie, Inc.*, 47 U.S.P.Q.2d 1020, 1025 (N.D. Cal 1998)(plaintiff's actions threatened to damage Hotmail's ability to service its legitimate customers).

intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time or some other legally protected interest of the possessor is affected as stated in Clause (c)." Restatement (Second) of Torts § 218(e)(1965).

As stated another way in *Ticketmaster Corp. v. Tickets.com, Inc.*:

A basic element of trespass to chattels must be physical harm to the chattel (not present here) or some obstruction of its basic function (in the court's opinion not shown here). . . The comparative use by the defendant of the plaintiff's computer system] appears very small and there is no showing that the use interferes to any extent with the regular business of [the plaintiff]. No. 99CV7654, 2000 WL 18887522, at *4 (C.D.Cal. Aug. 10, 2000), *aff'd.*, 2 Fed. Appx. 741 (9th Cir. 2001).

Although styled as an action for "e-trespass," Snow's counsel must have recognized that the law of trespass to chattels would bar his claim. Relying instead on a novel theory advanced in a law review article,[6] Snow seeks to avoid the obvious bar to his trespass claim by recasting it as a violation of the SCA. Section 2701 of the SCA makes it a criminal violation to "(1) intentionally access[] without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceed[] an authorization to access that facility;" and having gained such access, using it to "obtain[], alter[], or prevent[] authorized access to a wire or electronic communication while it is in electronic storage in such system." 18

---

[6] W.M. Motooka, CAN THE EYE BE GUILTY OF A TRESPASS? PROTECTING NONCOMMERCIAL RESTRICTED WEBSITES AFTER KONOP V. HAWAIIAN AIRLINES, 37 U.C. Davis L. Rev. 869, 870, 892 (2004). The author of this article, however, acknowledges that the Stored Communications Act, as written, does not create a cause of action for the kind of "e-trespass" that Snow alleges here. *See id.* at 884-91. As a result, she proposes an amendment to the SCA to give statutory effect to the terms of use for public, non-commercial websites. *Id.* at 892.

U.S.C. § 2701(a)(1), (2).  The SCA also provides bona fide victims of such conduct a civil cause of action.  *See* 18 U.S.C. § 2707.

Plaintiff's attempt to invoke the SCA is without merit for several reasons.  First, even accepting the plaintiff's allegations to be true -- though of course they may not be -- the public postings on Snow's website do not qualify as communications in "electronic storage" as that term is defined under the Act.  The postings on Snow's website were not in "temporary, intermediate storage … incidental to the electronic transmission thereof;" nor did they constitute "storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17)(A), (B).  Unlike private person-to-person emails awaiting retrieval in an individual's email account, the delivery of these forum posts was complete the moment they were posted.  Once placed online, these forum posts constitute published electronic content -- just like notes tacked to public bulletin boards in the physical world -- and were available to the general public in the same way as the classified section of the online New York Times is available to anyone who registers to use the New York Times website.  Because the public forum posts were designed for publication and are therefore not the types of private communications protected by the SCA, defendants could not have violated the SCA merely by viewing the contents of plaintiff's website, even had they done so without or in excess of authorization.

Second, plaintiff's allegation that representatives of the defendants acted "without authorization" under the SCA is incorrect as a matter of law.  Here, Snow had configured his website to be publicly accessible.  Accordingly, any access by the defendants was authorized, even if the defendants' alleged use violated a specified term of use.  *See* Orin S. Kerr, CYBERCRIME'S SCOPE: INTERPRETING 'ACCESS' AND 'AUTHENTICATION' IN COMPUTER MISUSE

STATUTES, N. Y. U. L. Rev. 1596, 1649 (2003) ("Breaches of regulation by contract should as a matter of law be held to be insufficient grounds for access to be considered "without authorization.") Although failure to adhere to a term of use may constitute a breach of contract, it alone does not transform the defendants' alleged access into criminal activity. If it did, every member of every ISP in the country would be guilty of a crime every time they cursed, threatened, defamed, uploaded infringing content, or in any other way violated a provision of an online use agreement. Neither individuals nor corporations can turn publicly configured websites into private spaces, and their visitors into criminals, merely by declaring that their otherwise public sites are off-limits to whatever competitors, watchdog groups, or people they find undesirable -- the law does not recognize it, and public policy does not allow it.[7]

## II. SNOW'S ALLEGATIONS

On October 20, 2004, Snow filed the instant action against DIRECTV, Stump, and Yarmuth. In his complaint, Snow alleged that Defendants had committed an "e-trespass" against him by accessing his website, www.stop-corporate-extortion.com ("Snow's website" or "the SCE Website") in violation of 18 U.S.C. § 2701.[8]

The SCE Website is described in his complaint, as a "non-commercial private support group Web site," first launched in October of 2003.[9] The SCE Website is hosted on the internet by a "web-hosting" company called Globat.com ("Globat").[10] As such, the SCE Website is maintained on computer web servers at facilities maintained by Globat, located in California, and

---

[7] Under plaintiff's theory, corporations could bring civil actions and criminal referrals against all of their competitors, as well as against every press outlet or public watchdog group in the country merely by including an express prohibition against access by such groups in their public website's terms of use.

[8] Compl. ¶¶ 1, 16, 58.

[9] Id. ¶ 13.

[10] Id. ¶ 25.

not at Snow's residence.[11]   Snow does not allege a violation of Globat's terms and conditions, nor a circumvention of any technical access restrictions imposed by Globat in his complaint.

The SCE Website is accessible to the public at large through the internet.   The SCE Website's homepage, "the very first Web page that a person views when visiting the SCE Website,"[12] informs the public that the site was created "'in response to questionable legal action from many Corporations [including DIRECTV] against the Free Citizens of the United States of America.'"[13]  The homepage warns visitors that "if [they] are ... DIRECTV, DishNetwork, RIAA, or any other Corporation seeking to sue individuals for alleged pirate acts, [they] are not welcome here and are expressly forbidden to view or enter this site."[14]

The SCE Website serves as a forum where visitors publish messages regarding issues "in large part, related to suits by DIRECTV against persons accused of stealing its satellite television signals." [15]  Snow does not allege that the SCE Website allows users to exchange private emails, nor that defendants gained access to any such private messages.

According to Snow, in order to access the SCE Website's "chat forums," a visitor has to create a password[16] and agree to the site's terms and conditions by "affirm[ing] that [he or she] is not associated with DIRECTV in any manner, including but not limited to; holder of any class of stock from the parent company or any subsidiary thereof, employee, legal representative, supplier or any relative of the aforementioned."[17]   Once a password has been created and the visitor has accepted the site's terms and conditions by clicking an "I Agree" button, that user can

---

[11] *Id.* ¶¶ 26-27.
[12] *Id.* ¶ 14.
[13] *Id.* ¶ 15.
[14] *Id.* ¶ 16.
[15] *Id.* ¶ 18.
[16] *Id.* ¶¶ 18-19.
[17] *Id.* ¶ 20.

proceed further to the site's forum pages, without any further technical restriction.[18]  According to the complaint, the SCE Website does not have any code-based restrictions or security measures.  User access does not require payment or Snow's prior authorization.

In support of his allegations against Defendants, Snow appears to rely on the SCE Website's log files that are periodically generated as part of the SCE Website "administerial functions."[19]  Snow alleges that the log files show "the Internet Protocol ("IP") addresses of computers belonging to or used by persons or entities that visit the website,"[20] though none are specified in the complaint.

Snow does not allege that any of the Defendants hacked into the SCE Website by breaking a password, or by using someone else's password.  Instead he alleges that the Defendants were unauthorized to view the SCE Website because they misrepresented their association with DIRECTV.  Snow does not allege any injury or disruption to the SCE Website resulting from Defendants' access.

## III.  STANDARD FOR MOTION TO DISMISS

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be granted when "a court cannot 'identify each of the material elements necessary to sustain a recovery under some viable legal theory.'"  *Green v. Abony Bail Bond*, 316 F. Supp. 2d 1254, 1258 (M.D. Fla. 2004) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 684 (11th Cir. 2001), *reh'g denied*, 273 F.3d 395 (11th Cir. 2001), *cert. denied*, 534 U.S. 1129 (2002)).

Moreover, where on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action, the court should also grant a motion to dismiss.

---

[18] *Id.* ¶ 22.
[19] *Id.* ¶ 31.
[20] *Id.* ¶ 32.

*Marshall County Bd of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). "Although a plaintiff is not held to a very high standard in a motion to dismiss for a failure to state a claim, some minimal pleading standard does exist." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 289 F.3d 1268, 1270 (11th Cir.), *rev'd on other grounds*, 314 F.3d 541 (11th Cir. 2002) (*en banc*). As such, "'[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.'" *Jackson v. Bellsouth Telecommunications*, 372 F.3d 1250, 1263 (11th Cir. 2004) (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

For purposes of this case, the question of whether the communications on Snow's website were in "electronic storage" for the purposes of the SCA is a question of law capable of resolution on a motion to dismiss. *See In re Northwest Airline Privacy Litig.*, No. 04-126(PAM/JSM), 2004 U.S. Dist. LEXIS 10580, at *6 (D.Minn. June 6, 2004.

## IV. THE PUBLIC MESSAGE BOARD POSTS DISPLAYED ON SNOW'S WEBSITE ARE NOT COMMUNICATIONS "IN ELECTRONIC STORAGE."

In order to establish a violation of the SCA, Snow must demonstrate that the defendants' actions constituted unauthorized access to a "facility through which an electronic communication service [was] provided," 18 U.S.C. § 2701(a)(1), and that Defendants obtained "access to a wire or electronic communication while it [was] in electronic storage." *See* 18 U.S.C. § 2701(a)(2). Even if Snow's website is deemed to be a facility providing electronic communications service,[21]

---

[21] Snow's complaint is not clear on what "facility" was allegedly accessed without authorization. Snow alleges that his own website terms were violated, but does not appear to allege that his website is an SCA "facility." He alleges, instead, that Globat, the web hosting provider with whom Snow contracted, qualifies as an SCA "facility." (Compl. ¶¶ 25-28). Snow likely blurs this line intentionally, recognizing a fundamental flaw in his attempt to make out an SCA claim. The gist of his claim is that the "facility" victimized by Defendant's alleged intrusion is Snow's website, but that website is merely an online destination, falling outside the protected class of electronic communication service providers. *See, e.g., Crowley v.*

(continued)

his website's content is not protected by 18 U.S.C. § 2701 because the posts published to Snow's forum site are not communications in "electronic storage" as that term is defined under the SCA. Unlike other sections of the SCA placing limitations on the disclosure of customer information, § 2701 protects only a narrowly subscribed class of communications, namely those in "electronic storage." The postings on Snow's public message board, whose transmission and publication were complete, plainly fail to meet the definition of electronic storage contained in § 2510(17).

### A. The SCA Protects Only Private Communications Intended to be Limited to the Sender and Intended Recipient.

The SCA establishes a clear hierarchy of privacy protection for electronic communications in the possession of third-party service providers, with information held in "electronic storage" at the top. In recognition of the special status afforded person-to-person communications exchanged via private customer email accounts, this limited class of communications is afforded much greater protection than, for example, customer information, messages shared via a community bulletin board, or data that is stored with a third party outsourcer. Accordingly, the SCA creates criminal liability under § 2701 for anyone accessing communications in "electronic storage" without authorization, and the SCA also prohibit ISPs from disclosing such communications to the government unless the government first obtains a search warrant. *See* 18 U.S.C. §§ 2701(a), 2703(a). These special protections have never been extended beyond private, person-to-person communications stored by a third-party ISP on behalf

---

*CyberSource Corp.*, 166 F. Supp. 2d 1263, 1270 (N.D. Cal. 2001) (a web site is not a provider of electronic communication service, even though it may send and receive electronic communications from customers); Orin S. Kerr, A USER'S GUIDE TO THE STORED COMMUNICATIONS ACT, AND A LEGISLATOR'S GUIDE TO AMENDING IT, 72 Geo. Wash. L. Rev. 1208, 1230 (2004) (eBay does not provide electronic communications service because "the site is a destination online, not a provider that gives users the ability to send and receive communications to the rest of the Internet."). If Globat is the "facility," however, none of Globat's terms of use were alleged to have been violated.

of its individual subscribers.[22]  There is nothing in the SCA, its legislative history, or case law to suggest that public-forum postings and similar published content on Internet websites fall within this protected class.

The SCA's legislative history makes clear that Congress passed the SCA to resolve ambiguities about privacy protection for private email communications.  The Senate Report noted that "[a] letter sent by first class mail is afforded a high level of protection against unauthorized opening by a combination of constitutional provisions, case law, and U.S. Postal Service statutes and regulations . . . [b]ut there are no comparable Federal statutory standards to protect the privacy and security of communications transmitted by new non-common carrier communications services or new forms of telecommunications and computer technology."  S. Rep. 99-541, at 5 (1986), *reprinted in*, 1986 U.S.C.C.A.N. 3555, 3559.  The Act is designed to "protect privacy interests in personal and proprietary information, while protecting the Government's legitimate law enforcement needs,"  *Id.*  at 3, *reprinted in*, 1986 U.S.C.C.A.N. 3555, 3557, and thus prohibits providers from "knowingly divulging the contents of any electronic communication while in electronic storage by that service to any person other than the addressee or the intended recipient."  *Id.* at 37, *reprinted in*, 1986 U.S.C.C.A.N. 3555, 3591.

The House Report further delineates the distinction between the private individual communications protected by § 2701 and those, like posts to a community forum, that are not protected.

---

[22]  Reading "electronic storage" more broadly would result in a significant expansion of criminal liability, because civil liability under § 2707 is coextensive with criminal liability under § 2701. This result is contrary to the canon of statutory interpretation disfavoring a broad reading of a criminal statute. *See Jones v. United States*, 529 U.S. 848, 858 (2000).  It would also have a profound effect on law enforcement. *See* Note 23, *supra*, and accompanying text.

Some communication systems offer a mixture of services some, such as bulletin boards, which may be readily accessible to the general public, while others--such as electronic mail--may be intended to be confidential. Such a system typically has two or more distinct levels of security. A user may be able to access electronic bulletin boards and the like merely with a password he assigns to himself, while access to such features as electronic mail ordinarily entails a higher level of security (i.e., the mail must be addressed to the user to be accessible specifically). Section 2701 would *apply differently to the different services.* Those wire or electronic communications which the service provider attempts to keep confidential would be protected, while the statute would impose no liability for access to features configured to be readily accessible to the general public. H.R. Rep. No. 99-647, at 63 (1986).

In *Steve Jackson Games*, one of the most significant SCA decisions, the Fifth Circuit Court of Appeals recognized this same distinction. In that case, the defendant operated a bulletin board service that offered users both the ability to publish content to the entire community visiting the board, and to private individual email accounts. The Court began its analysis of the SCA's application by noting that "[c]entral to the issue before us, the BBS also offered customers the ability to send and receive private E-mail," which supported its ultimate holding that copies of those messages stored on the operator's servers pending retrieval by those individual account holders were in electronic storage. *Steve Jackson Games v. United States Secret* Service, 36 F.3d 457, 458 (5th Cir. 1994).

Here, Snow has not alleged that any private email accounts were accessed by the defendants. Instead, the postings Snow seeks to protect fall well on the other side of the line drawn by the SCA. The messages on Snow's site are published for any visitor to read. These messages are not intended to be private communications, unless private is redefined to mean 99.99% of the world's population, but not DIRECTV employees. Thus, the Act, its legislative history, and the line of relevant case authority clearly distinguish between unretrieved private messages held in private accounts (which may or may not meet the narrow definition of

"electronic storage") and the published content on online destinations like Internet websites (which can never meet it). As a leading commentator on computer crime issues has explained: "[t]here are many problems of Internet privacy that the SCA does not address. The SCA is not a catch-all statute designed to protect the privacy of stored Internet communications; instead it is narrowly tailored to provide a set of Fourth Amendment-like protections for computer networks."[23] Snow's website, like those of individual bloggers, the New York Times, and scores of online merchants, qualifies him as a "publisher" of Internet content, but not an entity holding communications in electronic storage. *See Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) (America Online is a publisher with regard to messages posted on its online forums); *ACLU v. Reno*, 217 F.3d 162, 169, (3rd Cir. 2000) (noting that "[t]he World Wide Web is a publishing forum consisting of millions of individual 'Web sites,' ... [and] is the best known method of communicating information online").

Finally, the absurdity of Snow's invocation of the SCA is amply demonstrated by considering the effect of his analysis upon law enforcement. Under the SCA, communications that are in "electronic storage" cannot be obtained by the government without a search warrant,[24] whereas the contents of communications maintained online by a remote computing service can be provided to the government upon receipt of a subpoena. *See* 18 U.S.C. § 2703(b)(1)(B)(i). If all the posts on Snow's website are in "electronic storage," the government would be prohibited from obtaining such contents without a search warrant, notwithstanding the fact that anyone who is not a DIRECTV representative is expressly authorized to come in and view the content.

---

[23] Kerr, USER'S GUIDE, *supra* note 7, at 1214; *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003)(SCA does not apply to hacking into personal computers to retrieve information stored therein).
[24] *See* 18 U.S.C. § 2703(a).

**B. The Forum Posts on Snow's Website Do Not Meet Either Statutory Definition of Communications in Electronic Storage.**

The SCA defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). Only those private communications meeting one of these two conditions merits protections under the SCA. Just as Courts have consistently limited § 2701's reach to private, person-to-person communications, they have also uniformly restricted the subset of those communications qualifying for protection under the definition of electronic storage to messages not yet retrieved by the intended recipient. Although courts have split in their interpretation of what constitutes a "backup" under subsection (B) of § 2510(17), neither of the countervailing views reaches broadly enough to encompass the content for which Snow seeks protection.

**1. The forum posts transmitted and residing on Snow's website are not being stored "incidental to transmission."**

As first recognized by the Fifth Circuit in *Steve Jackson Games* and subsequently accepted by the Ninth Circuit and several district courts, subsection (A) of § 2510(17)'s "temporary, intermediate storage . . . incidental to transmission," definition applies only to "messages not yet delivered to their intended recipient." 36 F.3d at 461-62; *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004), *cert. denied*, 125 S. Ct. 48 (2004); *Fraser v. Nationwide Mut. Ins. Co.*, 135 F. Supp. 2d 623, 635-36 (E.D. Pa. 2001) (messages in post-transmission storage outside scope of § 2701), *aff'd in part, vacated in part on other grounds*, 352 F.3d 107 (3rd Cir. 2003); *In re Doubleclick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001) (§ 2701 only protects communications "stored 'for a limited time' in the 'middle' of transmission, i.e., when an electronic communication service temporarily stores a

communication while waiting to deliver it") (citation omitted); *In re Toys R Us, Inc. Privacy Litig.*, MDL No. M-00-1381 MMC, 2001 U.S. Dist. Lexis 16947, at *10-11 (N.D. Cal. Oct. 9, 2001)(same).

Thus, once a message has been transmitted to its intended recipient, that message is no longer in electronic storage as defined by subsection (A). The messages published to Snow's forum website clearly fall outside this definition. Unlike an email message awaiting retrieval by the specific intended recipient, the transmission of messages to Snow's website is complete upon their posting. Once the messages have appeared on Snow's website, they have reached their final destination, and neither Globat nor Snow is preserving the sole copy of the message pending its publication.

### 2. The copies of the forum posts residing on Snow's website are not being held by Globat for backup protection.

Subsection (B) of § 2510(17) has been read in two slightly different ways by courts examining what constitutes "storage of such communication by an electronic communication service for purposes of backup protection." The consensus view until recently, and the position adopted and advocated by the U.S. Department of Justice, is that subsection (B) refers only to additional backup copies of messages that themselves qualify under subsection (A).[25] This would include, for example, an ISP's own backup of its system if the backup includes the messages that were not delivered to the recipient at the time of the backup was made. This interpretation is supported by a literal reading of the provision, as well as both case law and the SCA's legislative history.

---

[25] *See Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 86-87 (2d ed. 2002), available at http:\\www.cybercrime.gov/s&smanual2002.pdf. *See also Theofel v. Alwyn Farey-Jones*, Sept. 25, 2003 Br. for the United States as Amicus Curiae Supporting Def./Appellee Pet. For Reh'g & Suggestion for Reh'g En Banc at 7 (attached hereto as Ex. C).

First, the plain language of subsections (A) and (B), read together, make clear that subsection (B) refers back to the communications defined in (A). Specifically, subsection (A) limits its application to storage of "communication incidental to the electronic transmission thereof." Subsection (B) then references storage "for purposes of backup protection of *such* communication." *See* 18 U.S.C. § 2510(17)(B). By limiting its reach not to electronic communications generally but to *such* communication, the statute makes clear that the "backup" language refers only to backups of the communications described in the antecedent subsection, namely, those in temporary, intermediate storage incidental to transmission.

This reading is supported by the legislative history of the SCA and the Act's overall privacy hierarchy. For example, 18 U.S.C. § 2702(a)(2) and 2703(b) set limitations on when a provider of "remote computing service," as opposed to a provider of "electronic communications service," can disclose the contents of electronic communications to the government. The SCA's legislative history makes clear that contents of files and communications, like forum posts, held for extended periods of time on behalf of the subscriber are subject to the protections reserved for remote computing services. For instance, the House Report explains:

> "In the case of electronic mail . . . [s]ometimes the addressee, having requested and received a message, chooses to leave it in storage on the service for re-access at a later time. The Committee intends that, in leaving the message in storage, the addressee should be considered the subscriber or user from whom the system received the communication for storage, and that such communication should continue to be covered by section 2702(a)(2)." H.R. 99-647, at 65

In other words, messages that a recipient has accessed but chooses to leave on the server are treated as messages held by a remote computing service, and specifically not as messages in "electronic storage."[26]

As the district court in *Fraser v. Nationwide Mut. Ins. Co.* recognized, once the process of transmission to the intended recipient has been completed, the copy is simply a remotely stored file. *See* 135 F. Supp. 2d at 635-38. The Fraser decision squares with the intent of the SCA to reserve the highest protection for those copies of messages akin to sealed letters carried by the U.S. Post Office prior to final delivery and the tearing of the envelope by the intended recipient.[27] Under this reading, which removes all post-transmission storage from the reach of § 2701, Snow's claim clearly cannot stand.

The Court of Appeals for the Ninth Circuit recently adopted a different view of when e-mails held by a provider on behalf of a subscriber may qualify as backup copies under subsection (B). In *Theofel v. Farey-Jones*, the Court rejected *Fraser's* reading of "backup" as too narrow, and instead read subsection (B) to include copies of private email messages retained on an ISP's server after delivery to the recipient.[28] 359 F.3d at 1075-1077. The Court explained when such a message should be deemed stored for "purposes of backup protection":

---

[26] Committee reports generated in subsequent attempts to amend the SCA confirm this reading. *See* H.R. Rep. No. 106-932, at 7 (2000) (considering and rejecting amendment to definition of electronic storage to include "any storage of an electronic communication by an electronic communication service *without regard to whether the communication has been accessed by the intended recipient*") (emphasis added); H.R. Rep. No. 107-236 (Pt. 1), at 57 (2001) (recognizing that current version of SCA limits "electronic storage" to unopened email).

[27] *See also* Kerr, USER'S GUIDE, *supra* note 7, at 1216-1217.

[28] The *Theofel* Court rejected *Fraser's* reading because it believed it rendered subsection (B) as redundant because any backup of a subsection (A) communication would also qualify under subsection (A) itself. But a leading commentator has explained that the *Theofel* court neglected to recognize that subsection (B) was designed to serve a significant, independent purpose. Specifically, the backup provision serves to prevent the government from circumventing the

(continued)

> An obvious purpose for storing a message on an ISP's server after delivery is to provide a *second copy* of the message in the event that the user needs to download it again--if, for example, the message is accidentally erased from the user's own computer. The ISP copy functions as a "backup" for the user. *Id.* at 1075 (emphasis added).

Under the *Theofel* Court's unique reading, if the ISP is holding the message for this specific backup purpose, then its copy may be considered in electronic storage.

Although *Theofel* would expand the scope of "electronic storage" to a broader set of backup copies, even such expansion is not broad enough to aid Snow. The critical language in *Theofel* is that backup copies retained by an ISP are a *second copy* of the message retained after delivery. In Snow's case, the copies of the forum posts at issue are the *only copies*. The forum posts are not private communications between two email accounts, where the recipient may access the message, download it to his hard drive, and permit the ISP to maintain a backup copy for possible later retrieval. Once the posts are transmitted to the website, the permanent copy of the post resides on the website for all to see -- there is no cause for a backup, and indeed Snow does not allege that one is kept. Accordingly, the message posts published to Snow's website constitute one of the "many instances" recognized by *Theofel*, even under its broader reading, where a provider "could hold messages not in electronic storage." 359 F.3d at 1076.

---

SCA's stringent privacy protections for unretrieved emails by attempting to access backup copies of those messages made by the ISP for its administrative purposes. ISPs regularly generate backup copies of their servers in the event of a server crash or other problem, and they often store these copies for long periods of time. Section 2510(17)(B) provides that backup copies of unopened e-mails are afforded the same protection as the original copy even though they are not themselves incident to transmission; without this provision, copies of unopened e-mails generated by this universal ISP practice would be unprotected by the SCA. *See* Kerr, User's Guide, *supra* note 7, at 1243 n.6.

## V.   DEFENDANTS' CONDUCT WAS NOT "WITHOUT AUTHORIZATION" OR "IN EXCESS OF AUTHORIZATION" UNDER THE SCA.

Even if the forum posts on plaintiff's website constitute communications in "electronic storage," defendants' alleged viewing of such communications was authorized for purposes of the SCA. Plaintiff's claim, that the defendants acted without or in excess of authorization, is based solely on his stated restrictions on who was prohibited from accessing his website. As alleged in his complaint, his disclaimer read:

> This is a private site and is solely and expressly for the benefit of individuals who have been (and won), are being or will be sued by any Corporate entity. . . If you are an employee, supplier, agent or relative of any of the previous noted classifications of DirecTV, Dish Network, RIAA or any other Corporation seeking to sue individuals for alleged pirate acts, you are not welcome here and are expressly forbidden to view or enter the site. (Compl. ¶ 16.)

The only technical restriction on access, however, as alleged in the complaint was the prerequisite that a visitor had to click an acknowledgement that he or she was not a representative of DIRECTV:

> You acknowledge this is a private web site and exists purely for the benefit of those defending themselves in civil Court. You affirm that you are not associated with DIRECTV in any manner, including but not limited to; holder of any class of stock from the parent company or any subsidiary thereof, employee, legal representative, investigator, supplier or any relative of the aforementioned …. (Compl. ¶ 20.)

Plaintiff does not allege that any of the defendants "hacked" into his website by breaking the password, or by using someone else's password. Instead, plaintiff's allegation is quite narrow -- that by making a misrepresentation as to their association with DIRECTV -- all of the defendants committed criminal violations of the Stored Communications Act, for which Snow is entitled to recover civil damages. Plaintiff's allegations of unauthorized access are insufficient to state a claim upon which relief can be granted for two reasons: (1) Snow's website was

configured to be available to the public, and therefore the SCA does not apply; (2) even if defendants agreed to the terms of use, their access of plaintiff's website would not be deemed without or in excess of authorization for purposes of the SCA.

### A. Plaintiff's Website Was Not a "Private" Website. It was a Website Designed and Configured to Accessible to the General Public.

Based on the allegations in the complaint, Plaintiff's website did not function to exclude the general public. As described in the complaint, plaintiff placed no code-based or other technological restrictions on registration to access his forums. Access did not require payment, nor Snow's prior authorization. Instead, as described in the complaint, the website was universally accessible, provided that the user of the website made a representation that he was not associated with DIRECTV in any manner (Compl. ¶ 20), qualifying more than 99.99% of the world's population for membership. The SCA simply does not protect communications contained on a website configured in this manner.

The legislative history of the SCA demonstrates that Congress intended to protect electronic communications that are configured to be private. *See* S. Rep. No. 99-541, at 35, *reprinted in*, 1986 U.S.C.C.A.N. 3555, 3585. ("This provision of [the SCA] addresses the growing problem of unauthorized persons deliberately gaining access to . . . electronic or wire communications that are not intended to be available to the public."); H.R. Rep. No. 99-647, at 63.[29] Unlike the situation in *Konop*,[30] where the owner of the website had configured the website to allow entry only to an authorized list of company employees, plaintiff's website was configured to be available open to all.

---

[29] *See also Konop*, 302 F.3d 868 at 875.
[30] Even with these facts, the Court in *Konop* did not rule on the question of whether the defendant's access in that case was "'without authorization.'" 302 F.3d at 879 n.8.

A holding that a publicly configured website can be made private for purposes of the Stored Communications Act merely through a term of use would have tremendously unsettling results. As Orin Kerr noted in his article "CyberCrime's Scope," under such an interpretation of the SCA, "[a] computer owner could set up a public web page, announce that 'no one is allowed to visit my web page,' and then refer for prosecution anyone who clicks on the site out of curiosity." N.Y.U. L. Rev. 1596, 1650-1651. This is not, and cannot be the law. As a result, given the alleged configuration of Snow's website, the defendants could not have accessed the website without authorization, or in excess thereof, as a matter of law.

**B.    Any Misrepresentations by Defendants as to Their Non-Affiliation with DIRECTV Does Not Make Their Access of Plaintiff's Website Without or in Excess of Authorization.**

The term "without authorization" is not defined in the SCA nor under the Computer Fraud and Abuse Act. *See Konop*, 302 F.3d 868 at 879 n.8. However, the general purpose of the SCA was to create a cause of action against computer hackers.[31] As a result, what is clear in the caselaw is that "[w]here a party consents to another's access to its computer network, it cannot claim that such access was unauthorized." *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F. Supp. 2d 817, 821 (E.D. Mich. 2000); 18 U.S.C. § 2701(c) ("Subsection (a) of this section does not apply with respect to conduct authorized– (1) by the person or entity providing a wire or electronic communications service")    According to the allegations in the complaint, defendants applied for and were granted access to Snow's website. (Compl. ¶¶ 42, 50, 58.) Snow, however, appears to claim that such authorization was not valid because of the misrepresentation.

---

[31]    W.M. Motooka, CAN THE EYE BE GUILTY OF A TRESPASS? PROTECTING NONCOMMERCIAL RESTRICTED WEBSITES AFTER KONOP V. HAWAIIAN AIRLINES, 37 U.C. Davis L. Rev. 869, 890 (2004); H.R. Rep. No. 99-647, at 63 (1986).

In considering the scope of authorization for purposes of SCA cases, some courts have referred to trespass and other traditional doctrines where criminal and/or tort liability is based on consent in order to determine the legal effect of obtaining consent based on incomplete or inaccurate representations. *See Theofel*, 359 F.3d at 1073 ("[p]ermission to access a stored communication should constitute valid authorization if it would defeat a trespass claim in analogous circumstances").

Of the real-world trespass cases considering the question of authorization based on misrepresentation, *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345 (7th Cir. 1995) is the most significant. In *Desnick*, the plaintiff doctor and his ophthalmic clinic brought claims for trespass, privacy violations and illegal wiretapping against the American Broadcasting Corporation ("ABC") for sending "test" patients, who were really investigative reporters, into the plaintiff's eye care facility. In rejecting the plaintiff's claims, the court analyzed those circumstances, including trespass and battery cases, in which the law gives legal effect to consent even when consent is procured by misrepresentations.[32] If such misrepresentations were always precluded, the court noted that "a restaurant critic could not conceal his identity when he ordered a meal, or a browser pretend to be interested in merchandise that he could not afford to buy. Dinner guests would be trespassers if they were false friends who never would have been invited had the host known their true character...." *Desnick*, 44 F.3d at 1351.[33]

---

[32] The *Desnick* court also observed that, "[t]he law's willingness to give effect to consent procured by fraud is not limited to the tort of trespass," but also encompasses battery, and sexual relations. 44 F.3d. 1345 at 1352; *see* Restatement (Second) of Torts § 892B, Illustration 9, (1979).

[33] *See also Commonwealth v. Proetto*, 2001 PA Super. 95, ¶¶ 31-32 (police officer did not receive communications without consent when misrepresenting his identity in an online chat room), *aff'd.*, 575 Pa. 511 (2003).

In distinguishing the circumstances under which authorization or consent procured by a misrepresentation is deemed to be effective consent from the circumstances where such consent is invalid, the court said:

> How to distinguish the two classes of cases--the seducer from the medical impersonator, the restaurant critic from the meter-reader impersonator? The answer can have nothing to do with fraud; there is fraud in all the cases. It has to do with the interest that the torts in question, battery and trespass, protect. The one protects the inviolability of the person, the other the inviolability of the person's property. The woman who is seduced wants to have sex with her seducer, and the restaurant owner wants to have customers. The woman who is victimized by the medical impersonator has no desire to have sex with her doctor; she wants medical treatment. And the homeowner victimized by the phony meter reader does not want strangers in his house unless they have authorized service functions. *Desnick*, 44 F.3d at 1352.

Based on this analysis, the court ruled that the use of test patients in *Desnick* did not invade any of the specific interests that the tort of trespass seeks to protect -- because the plaintiff was offering his services to the public generally, even if he would not have offered them to members of the public who were testers. Furthermore, the misrepresentation caused no disruption to the office, nor did it invade any space that the Doctor was unwilling to share with the general public. Accordingly, the misrepresentation by the testers did not defeat consent for either the trespass or the privacy claim.[34]

Similarly, in *Food Lion v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999), a grocery store brought a variety of claims, including trespass, against ABC for the conduct of its employees who had applied for and taken jobs at Food Lion in order to get broadcast material.

---

[34] The court observed that the Doctor's office was not festooned with signs expressly prohibiting the presence of "undercover" testers, but noted that it was not sure such signs would make any difference, especially under Eleventh Circuit jurisprudence. *Id.* at 1353., *see United States v. Centennial Builders, Inc.*, 747 F.2d 678, 683 (11th Cir. 1984); ("[u]ndercover work is a legitimate method of discovering violations of civil as well as criminal law").

Citing with approval the analysis in *Desnick*, the Court held that the defendants could not be held guilty of trespass for making misrepresentations on their job applications as to their identity and background, because such misrepresentations did not nullify defendants' consent to be on Food Lion's premises.[35] *See Food Lion*, 194 F.3d at 517-518; *see also American Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 239 Mich. App. 695, 706-709 (2000) (citing with approval, *Desnick* and *Food Lion*).

Simply put, the holdings of *Desnick*, *Food Lion* and other real-world trespass related cases demonstrate that consent procured based on identity misrepresentations will not generally vitiate consent, where there is no subsequent improper activity by the defendant beyond the scope of the consent provided the defendant. This is also the law in California, where the Globat web hosting facility in this case was located.[36] *See, e.g., Baugh v. CBS, Inc.*, 828 F. Supp. 745, 757 (N.D. Cal. 1993) ("[i]n a case where consent was fraudulently induced, but consent was nonetheless given, plaintiff has no claim for trespass").[37]

---

[35] The court found that the defendants could be held liable for trespass based only on their breach of duty to their new employer, Food Lion, which was triggered not by their misrepresentations, but their use of cameras in non-public areas -- conduct which would not have been permitted for any Food Lion employee, even those who had not made misrepresentations.

[36] To the extent the court is looking to real world trespass law, it should consider California, not Florida law. The Globat computers were located in California, therefore California has the "most significant relationship" to this case. *See* Restatement (Second) of Conflict of Laws § 145(1) (1971).

[37] The distinction between fraud as to the identity of the person seeking consent and fraud as to what that person intends to do, has been referred to by commentators as the difference between "fraud in the inducement" and "fraud in the factum." As commentators have stated "when a victim agrees to allow the defendant to engage in specific conduct in reliance on a misrepresentation the consent is based on fraud in the inducement and the consent remains valid despite the misrepresentation. The element "without consent" or "without authorization" normally will not be met. *See Kerr, at 1653, citing* Rollin M. Perkins & Ronald N. Boyce, Criminal Law 1075 (3d ed. 1982).

In this case, like *Desnick*, the plaintiff's website was open to members of the public, and there is no allegation that the defendants exceeded the authorization provided by Snow to access any materials other than what a member of the public would have been able to view. As a result, there were no protectable privacy interests that were intruded upon by the defendants' access.

### C. Plaintiff's Narrowly Tailored Restriction on Access by DIRECTV to a Publicly Open Website Is Void as Against Public Policy.

Plaintiff's claim must also be dismissed since the restriction on DIRECTV's entry is void as against public policy. There is a legitimate and substantial public interest against sanctioning non code-based restrictions on access that are limited to a specifically-identified subsection of the public. Allowing such restrictions would shield wrongdoers from watchdogs, press, or law enforcement, and could impose an unfair restraint of trade on companies' efforts to protect their valuable goodwill. In this case, Plaintiff has no compelling interest to justify enforcement of the discriminatory restriction.

It is well established that a promise or term of agreement is unenforceable on the grounds of public policy if the interest in enforcement is outweighed by a public policy harmed by enforcement. *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987); *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1396 (9th Cir. 1991) (citing Restatement (Second) of Contracts § 178 (1979)). If no legislation regulates the conduct at issue, courts must weigh the parties' and public interest in enforcement of the contested term against the strength of the public policy that would be harmed or impaired by enforcement. *Davies*, 930 F.2d at 1396; *see also* Restatement (Second) of Contracts (1979) § 178. In determining whether a term should be enforced, or whether enforcement would compromise the public interest, the court must consider "(a) the parties' justified expectations, (b) any forfeiture that would result if enforcement were denied,

and (c) any special public interest in the enforcement of the particular term." Restatement (Second) of Contracts § 178(2) (1979).

No court has directly addressed the issue of whether public policy prohibits the enforcement of contract based restrictions on access to a publicly configured website to only specifically identified parties. But, in dicta in *EF Cultural Travel BV v. Zefer Corp.*, the court acknowledged that the use of explicit statements as the only method of restricting access would evoke public policy concerns. 318 F.3d 58, 62 (1st Cir. 2003)("[w]hether public policy might in turn limit certain restrictions is a separate issue").

The court in *EF Cultural Travel* correctly understood that the canons of contract and discrimination law may prohibit the type of restriction imposed by Plaintiff here. As discrimination is contrary to the public policy of the United States, the public interests at stake are of the highest order. Narrowly tailored discriminatory prohibitions on access to otherwise publicly available information would negatively hamper law enforcement, press reporting, watchdog oversight of claims, and the ability to protect oneself against unlawful and harmful acts. Individuals, associations and companies have a compelling right to view information otherwise publicly displayed to assure that it does not include slander, unlawfully disparaging statements, illegal infringement, or factually untrue assertions that could mislead the general public. Allowing Plaintiff to enforce a term prohibiting DIRECTV from viewing a website designed only to foster communication by individuals extremely critical of DIRECTV would be akin to sanctioning a diet pill website prohibiting access by FDA regulators, a site selling unlicensed and infringing Mickey Mouse T-shirts prohibiting access by employees or agents of

Disney and more broadly, would encourage the posting of "no press" or "no cops allowed" signs all over the world wide web.[38]

Additionally, a contract or covenant "is unenforceable on grounds of public policy if it is unreasonably in restraint of trade." Restatement (Second) of Contracts § 186(1), (2) (1981) . A restriction is unreasonably "in restraint of trade if its performance would limit competition in any business...." *Id.* Plaintiff's website forum solicited and displayed negative commentary about DIRECTV. DIRECTV, as does any commercial entity, has a valuable commercial interest in its goodwill with consumers, and protecting its brand. A critical element of a company's ability to protect these assets is knowledge of public perception of the company, and detection and prevention of unlawful statements (either disparaging or untrue) about the company, or infringing use of company trademarks and other intellectual property. Where a forum is open to the public, it would be an unfair restraint on DIRECTV's ability to protect and conduct its business if the public universe had access to information about the company, but DIRECTV alone did not. This would limit DIRECTV's ability to effectively compete in the marketplace.

When there is a substantial public interest that would be harmed by enforcement -- as is the case here -- the Plaintiff must advance some compelling interest in enforcement. For example, an adult oriented website has a compelling interest in restricting access by minors. Therefore, it is a legitimate prohibition to refuse access to children under 18 years of age. In the present case, however, the Plaintiff does not have a legitimate interest in restricting access only by persons affiliated with DIRECTV, but otherwise hosting a public forum. Plaintiff could have

---

[38] It is irrelevant whether any illegal activity occurred on Plaintiff's site. If a restriction "tends to the public injury, it should be annulled without regard to whether public injury had in fact resulted." *James v. Marinship Corp.*, 155 P.2d 329, 339 (S. Ct. Cal. 1944) (citation and quotation marks omitted).

created a private forum that restricted access to a limited membership. Plaintiff cannot, however, justify or provide legitimate rationale for a compelling need to host a universally public forum *about* DIRECTV but also *solely exclude* DIRECTV.[39]

Employing the balancing test enumerated in *Rumery*, and expanded upon in *Davies* and *United States v. Northrop Corporation*, 59 F.3d 953 (9th Cir. 1995), this court should consider the restriction on access to Plaintiff's website void as against public policy. Plaintiff has no justification for the restrictive term of access, but allowing such narrowly defined restrictions to public information would harm the public by shielding wrongdoers from civil or criminal enforcement efforts, and promoting unreasonable restraints of trade.

## VI.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that this case be dismissed with prejudice.

December 17, 2004

Respectfully submitted,

/s/ Marc J. Zwillinger
Marc J. Zwillinger
Christian S. Genetski
Shahrzad Poormosleh
Sonnenschein Nath & Rosenthal LLP
1301 K Street NW
East Tower, Suite 600
Washington DC 20005
(202) 408-6400 (Telephone)
(202) 408-6399 (Facsimile)

Counsel for Defendants

/s/ Michael J. Corso, Esq.
Michael J. Corso, Esq.
Florida Bar No. 0228729
Bernard J. O'Donnell
Florida Bar No. 0387940
Henderson, Franklin, Starnes & Holt, P.A.
1715 Monroe Street
Post Office Box 280
(239) 344-4121 (Telephone)
(239) 344-4100 (Facsimile)

Counsel for Defendants

---

[39] Nor can Plaintiff legitimately claim that he had an expectation of confidentiality at the website's public forum sufficient to justify a belief that the website could be used to craft litigation strategy in secrecy.

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2004, I caused a true and correct copy of the
foregoing Defendants' Joint Memorandum of Law in Support of Motion to Dismiss to be served,
via Federal Express, upon the following counsel for Plaintiff Michael Snow:

Albert A. Zakarian
Law Offices of Albert A. Zakarian
2024 W. Cleveland Street
Tampa, FL 33606

Robert S. Apgood
Law Offices of Robert S. Apgood
500 Union Street, Ste. 510
Seattle, WA 98101

/s/ Marc J. Zwillinger
Marc J. Zwillinger

# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DIRECTV, Inc., a California )
corporation,                )
                            )
        Plaintiff,          )
                            )
vs                          )  CASE NO.
                            )  2:03-CV-394-FtM-29SPC
                            )
MIKE SNOW,                  )
                            )
        Defendant.          )
                            )


DEPOSITION OF:   MIKE SNOW


DATE:           June 23rd, 2004

TIME:           10:10 a.m. - 12:15 p.m.

TAKEN BY:       Counsel for Defendant

PLACE:          Fort Myers Court Reporting
                2231 First Street
                Fort Myers, Florida

REPORTED BY:    Maryanne Wagner, RPR
                Notary Public
                State of Florida at Large

FORT MYERS COURT REPORTING, INC.
2231 First Street
Fort Myers, Florida  33901
(239) 334-1411
FAX (239) 334-1476

1    A    Who's Deborah Snow?

2    Q    Is that a yes or a no?

3    A    If I was, I have no recollection.  I don't

4  know a Deborah Snow.

5    Q    Are you currently employed?

6    A    No.

7    Q    Who's your previous employer?

8    A    Excuse me, actually I'm employed.  I am in a

9  campaign to fight the evil devil Direct TV.

10    Q    Who was your previous employer?

11    A    Self-employed.

12    Q    Doing what?

13    A    I'm a contractor.

14    Q    What kind of contractor?

15    A    I build things.

16    Q    A general contractor?

17    A    I build things.

18    Q    Do you have a contractor's license?

19    A    No.  You asked and answered.

20    Q    How long were you self-employed as a

21  contractor?

22    A    All my life.

23    Q    For whom have you worked in the past five

24  years as a self-employed contractor?

25    A    Hooters.

1     Q     For whom do you perform these odd jobs?

2     A     Usually someone that I meet at Hooters that

3 needs some help.

4     Q     Are you paid for these odd jobs?

5     A     Lots of times. I take it out in trade for

6 beer.

7     Q     When was the last time you performed one of

8 these odd jobs for which you were paid or received

9 trade in beer?

10     A     Month ago.

11     Q     How many months?

12     A     I don't recall. I don't keep a diary.

13     Q     Other than performing odd jobs, do you have

14 any other source of income?

15     A     I have a promise on percentage when we beat

16 Direct TV in our class action malicious prosecution

17 lawsuit, which I'm working diligently towards.

18         For example, on 21 May, 2004, the law firm of

19 Stump and Storey hacked my website, and in less than

20 four minutes downloaded 71 items off of a copyrighted

21 private website, which is being taken to the courts as

22 we speak.

23     Q     Other than performing odd jobs, and your

24 promised income percentage on this potential malicious

25 prosecution lawsuit against Direct TV, do you have any

1    A    No.

2    Q    Do you have any retirement accounts?

3    A    No, not to my knowledge. That would have

4    required me to set one up being self-employed, no.

5    Q    Do you have any mutual funds?

6    A    No.

7    Q    Stocks or bond?

8    A    No.

9    Q    Do you own any copyrights?

10    A    Every piece of paper I ever write down is a

11    product of my intellect, and therefore I own a

12    copyright of everything that I write, yes. The web

13    page corporate-extortion, the one that Stump and

14    Storey went and ripped off on 21 May, 2004 is

15    copyrighted. And I have the 71 hits going direct back

16    to Stump and Storey law firm where they stole my

17    copyrighted material.

18    Q    Do you recall when that copyright was issued?

19    A    Copyrights don't work that way any longer.

20    Look up your law.

21    Q    Do you have any patents?

22    A    I'll answer that this way, I have no patent

23    that you can search directly has my name attached to

24    it.

25    Q    You have no patent in your name?

1    actually each and every single attorney is personally

2    liable for promoting these frivolous lawsuits and

3    false accusations.

4        Q    Other than stop-corporate-extortion.com, have

5    you ever been a member of a special interest forum or

6    chat room?

7        A    I go to Wumarkus.com, I think it is

8    M-A-R-K-U-S, I think that's right.  I also go to

9    FreedomFight.ca.  They are in Canada.  I also go to

10   DirecTVDefense.org.  I go to EFF.com.  There are just

11   so many out there that are fighting this extortion

12   thing.

13       Q    Have you ever been a member of a forum called

14   Pirate Den?

15       A    No.

16       Q    Have you ever been a member of a forum called

17   Searching for Signal?

18       A    No.

19       Q    Have you ever been a member of a forum group

20   called Hackp4?

21       A    No.

22       Q    What about Intermatrix 2?

23       A    No.

24       Q    Intermatrix 3?

25       A    No.

1   groups or forums on stop-corporate-extortion.com?

2       A    I don't have a physical list.

3       Q    Are you the moderator of these discussion

4   groups or forums?

5       A    No.

6       Q    Is there a moderator?

7       A    I am certain there are.  I am the

8   administrator.  In English terms I'm God Number One of

9   the website.

10      Q    Describe for me the discussion threads in the

11  forums on stop-corporate-extortion.com?

12      A    We discuss the extortion by Direct TV on

13  innocent people across the United States.

14      Q    In what manner?

15      A    That Direct TV without investigation filed

16  24,000 lawsuits across the nation.  The fact that they

17  have sued dead people, six-year-old children, blind

18  grandmothers, and it doesn't really matter.  We

19  discussed the fact that mathematically what they did

20  is they sat down, they issued over 200,000 letters and

21  mathematically in some room somewhere they sat down

22  and said gee, if we tell them to pay us $3,500 that

23  will be cheaper than them hiring a lawyer, so more

24  than likely most of them will settle with us and we'll

25  just rake in all this money, and there will be a few

1      A      No.  But it posts every letter you and I

2   write to each other.

3      Q      Does it post every pleading filed in the

4   instant case?

5      A      No.

6      Q      Some of the pleadings?

7      A      I would have to take a look what is there

8   right now.  But it may, and it may not.  I don't know

9   the answer to that just now.

10     Q      Does stop-corporate-extortion.com have a

11  discussion group related to defenses to Direct TV

12  lawsuits?

13     A      Absolutely.  That site exists solely for

14  people that defend themselves against Direct TV and

15  crooked lawyers.  It's privileged information.  A lot

16  of the work in there either comes from attorneys or

17  people that have talked to attorneys, and it's for the

18  defense of people.  Every time you walk into that web

19  site you set people free, because you are spying on

20  their defense.

21     Q      What other kinds of topic are discussed in

22  the forums on stop-corporate-extortion.com?

23     A      The future class action lawsuit, the civil

24  portions of that which should make most of these

25  people whole for being sued without just cause.  And

1   now we have now added the criminal aspects of this

2   where things are going to the Attorneys General, where

3   the attorneys are going to be prosecuted for their

4   partaking in such things.

5       Q    Any other topics that are discussed?

6       A    Direct TV, how do you defend yourself Direct

7   TV.  We are going to sue you.  That's pretty much it

8   Direct TV.

9           MR. SHERIDAN: I need to take a bathroom

10          break.

11          (Whereupon, a short break was taken.)

12  BY MR. SHERIDAN:

13      Q    When did you become aware that Direct TV

14  believed that you were intercepting its signal?

15      A    The night that I got served.

16      Q    Did you receive any letters from Direct TV

17  prior to being served?

18      A    No, because they assumed that I lived at some

19  address which is a strip mall in Cape Coral.  Like I

20  said, no investigation.  They should have called up,

21  wrote a letter, asked a question or something.  I am

22  certain that I'm going to be one of their favorite

23  people.

24      Q    When you received the summons and the

25  complaint, what did you do?

1    A    I did respond to them.  They were mailed out

2  and you had a certified paper to it.  It was sent to

3  you along with interrogatories to you that you failed

4  to respond to.

5    Q    Are you directly or indirectly involved in

6  any other Direct TV cases?

7    A    Yes.

8    Q    Which cases?

9    A    Thousands of them.  I don't know the specific

10  name of any of the Defendants, but I'm involved in

11  anybody who asks my help, they get it if they need to

12  find information.  I tell them where they can go find

13  it.

14    Q    In the State of Florida are you involved with

15  any other Direct TV cases?

16    A    In helping people?

17    Q    Yes.

18    A    Currently right now I don't believe there is

19  an active case that I'm consulting on in any way,

20  shape or form.  But I did  -- I did help out Nancy

21  Bates where I believe you settled for six or $700.

22  Darryl Shivley, which I believe you settled for $500.

23  Kim Arnold, I was present in the courtroom when

24  Jonathan Rose perjured himself in front of the court,

25  it was Friday the 13th, as I recall, you dismissed the

1    questions about each of these in order?

2    A    Sure.

3    Q    Would you please describe for me or tell me

4    what the topic in the forum posting in Exhibit 4 is?

5    A    CBS News.

6    Q    And what does the discussion thread generally

7    relate to?

8    A    The fact that we share information with

9    various news media, but CBS happened to pick it up.

10   Q    Did you make a posting in this discussion

11   thread?

12   A    Most certainly did.

13   Q    Related to what?

14   A    That CBS is going to be airing a segment on

15   Direct TV extortion.

16   Q    Thank you.

17   A    Here's another post in here, satellite

18   companies say they're protecting themselves from

19   people who steal their signals.

20   Q    If you would refer to Exhibit Number 5, which

21   would be the next one?

22   A    Counter-sue Direct TV using DMCA is the name

23   of the thread.

24   Q    Did you make a posting in this discussion

25   thread?

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

DIRECT, INC., a California corporation,

Plaintiff,

-vs-                                            Case No. 2:03-cv-394-FtM-29SPC

MIKE SNOW,

Defendant.
_____/

## ORDER

This matter comes before the Court on Plaintiff DIRECTV, Inc.'s Motion for an Order to Show Cause Why the Defendant, Mike Snow, Should not be Sanctioned (Doc. # 36) filed on April 13, 2004. The Plaintiff moves for sanctions under Rule 11 of the Federal Rules of Civil Procedure and pursuant to 28 U.S.C. § 1927.

On May 3, 2004, a hearing was held before the Honorable Sheri Polster Chappell regarding the issue of sanctions. At that hearing, Snow acknowledged that he made a phone call to an employee of DIRECTV offering her $2,500.00 for confidential files pertaining to, among other things, how DIRECTV files its lawsuits. Mr. Snow stated that he was seeking the information to build a potential class action lawsuit against DIRECTV for malicious prosecution. Snow further stated that he was in contact with attorneys who were advising him on how to proceed in the matter.

Rule 11 states that sanctions under the rule do not apply to disclosures and discovery requests. Fed. R. Civ. P. 11(d). The Plaintiff's attempted bribe was an illicit attempt to obtain discovery information and therefore, Plaintiff's motion for sanctions under Rule 11 was improperly brought and is due to be denied.

47

The Plaintiff also moved for sanctions under 28 U.S.C. § 1927, which states in pertinent part: "[a]ny attorney or other person admitted to conduct cases in any court of the United States or Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys fees reasonably incurred because of such conduct." Even through Snow is a *pro se* litigant, section 1927 allows the district court to assess attorney's fees against litigants who willfully abuse the judicial process by conduct tantamount to bad faith. Smartt v. First Union Nat'l. Bank, 245 F.Supp 2d 1229, 1233 (M.D. Fla. 2003).

The statute delineates three requirements to justify an imposition of sanctions: (1) unreasonable and vexatious conduct; (2) this unreasonable and vexatious conduct must multiply the proceedings; and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct. The term vexatious is not defined in the statute. However, the Courts in the Middle District of Florida have defined vexatious to mean "without reasonable or probable cause or excuse; harassing; annoying." Smartt, 245 F.Supp 2d at 1233 (citing *Black's Law Dictionary*, 1559 (7th ed. 1999); *See* Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't. of Health & Human Resources, 532 U.S. 598, 603, 121 S. Ct. 1835, 149 L.Ed. 2d 855 (2001) (holding that when a term is not defined in the statute courts typically rely on the terms ordinary meaning).

In assessing whether or not sanctions are necessary under the bad faith standard the Court's inquiry focuses primarily on the offending parties conduct and motives. Jerelds v. The City of Orlando, 194 F. Supp. 2d 1305, 1315 (M.D. Fla. 2002). In this case, Snow's conduct fits the required bad faith standard of vexatious conduct outlined in Smartt 245 F.Supp 2d at 1233. This is the third time the Court has found it necessary to address Snow's abuse of the judicial system.

Snow was previously warned by this Court, including a previous hearing for sanctions, that even though he is *pro se* his conduct and behavior must comply with the Federal Rules of Civil Procedure. Snow himself told Ms. Jones, the Plaintiff's employee, that there was no need to notify her superiors he had requested the confidential information. His secretive behavior and offer of a $2,500.00 bribe indicates to the Court that Snow understood that his conduct was inappropriate. Snow further stated that he had discussed the proposed phone call with several attorneys involved in similar litigation with DIRECTV. This demonstrates that he had some access to legal counsel that could have instructed him on how to properly request discovery. Thus, Snow's conduct is without reasonable or probable cause or excuse and resulted in unreasonable harassment and annoyance to the Plaintiff. As a result, the first requirement justifying the imposition of sanctions under 28 U.S.C. § 1927 has been met.

Regarding the statutes second requirement, that the unreasonable and vexatious conduct must multiply the proceedings, Snow's conduct required the Plaintiff to file the instant motion and wasted the Court's time and valuable judicial resources conducting a hearing into the facts surrounding the issue. Therefore, the proceedings were multiplied by Snow's conduct and the second requirement of 28 U.S.C. § 1297 was met.

In light of Snow's inappropriate behavior and his continued disregard of this Court's previous warnings concerning improper conduct, the Court finds that it is proper to impose sanctions under 28 U.S.C. § 1927 to hopefully deter Snow from continuing his bad faith conduct. *See* O'Rear v. American Family Life Assurance Co. of Columbus, Inc., 144 F.R.D. 410, 413 (M.D. Fla. 1992) (holding that the purpose of sanctions under 28 U.S.C. § 1927 is to deter abusive practices by litigants and that those who create unnecessary costs bear them).

Pursuant to the Court's directions Attorney for the Plaintiff Michael T. Sheridan, Esq. filed an affidavit itemizing attorneys fees of $3,285.00 and costs of $485.16 expended in preparing the motion. Included, in Atty. Sheridan's affidavit was $1,400.00 in fees and $434.72 in costs for travel to and from the hearing. However, travel expenses are not taxable costs under § 1927 and thus, those fees and costs will be excluded from the sanction. North American Foreign Trading Corp. v. Zale Corp., 83 F.R.D. 293, 299 (S.D.N.Y. 1979).

Further, given that the Defendant is acting *pro se*, the Court finds that the remaining fees and costs are somewhat excessive. When a court imposes sanctions under 28 U.S.C. § 1927, it must make sure that the amount of the sanction is a carefully measured response to the sanctioned conduct. O'Rear, 114 F.R.D. at 415. Under 28 U.S.C. § 1927, sanctions are to be more of a censure to vindicate the Court's authority and to hopefully ensure that the offending conduct is not repeated. *See* Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1337 (11th Cir. 2002) (holding that sanctions imposed under the Court's inherent power should "justly punish" the offending party and hopefully deter others from engaging in similar conduct). Therefore, the Court will limit the amount of the sanction for attorney's fees and costs to $600.00. Kostsileris v. Chalmers, 966 F. 2d 1181 (7th Cir. 1992) (reducing excessive attorneys fees incurred in responding to a belated jury request from $5,546.25 to $1,000.00).

Accordingly, it is hereby

**ORDERED:**

(1) Plaintiff DIRECTV, Inc.'s Motion for an Order to Show Cause Why the Defendant, Mike Snow, Should not be Sanctioned Pursuant to Rule 11 (Doc. # 36) is **DENIED.**

(2) Plaintiff DIRECTV, Inc.'s Motion for Sanctions Pursuant to 28 U.S.C. § 1927 is **GRANTED.**

(3) The Plaintiff is awarded **$ 600.00 in Attorney's Fees and Costs**. The Defendant has up to and including **June 30, 2004**, to pay the awarded fees and costs. Failure to pay the sanctions by June 30, 2004, may result in further sanctions including the Defendant being held in contempt of court.

**DONE AND ORDER** at Fort Myers, Florida, this _19th_ day of May, 2004.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:

Counsel of record
DCCD

-5-

Date Printed: 05/19/2004


Notice sent to:

    ____  Scott C. Roberts, Esq.
          Stump, Storey, Callahan, Dietrich & Spears, P.A.
          37 N. Orange Ave., Suite 200
          P.O. Box 3388
          Orlando, FL  32802-3388

          2:03-cv-00394    sll

    ____  Viktoria Collins, Esq.
          Stump, Storey, Callahan, Dietrich & Spears, P.A.
          37 N. Orange Ave., Suite 200
          P.O. Box 3388
          Orlando, FL  32802-3388

          2:03-cv-00394    sll

    ____  Michael T. Sheridan, Esq.
          Stump, Storey, Callahan, Dietrich & Spears, P.A.
          37 N. Orange Ave., Suite 200
          P.O. Box 3388
          Orlando, FL  32802-3388

          2:03-cv-00394    sll

    ____  Mike Snow
          1139 SE 29 St.
          Cape Coral, FL  33904

          2:03-cv-00394    sll

# EXHIBIT C

No. 02-15742

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

GEORGE THEOFEL, et.al.,
Plaintiffs-Appellants,

v.

ALWYN FAREY-JONES, et. al.,
Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING DEFENDANT/APPELLEE'S PETITION
FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC**

———————————

CHRISTOPHER A. WRAY
Assistant Attorney General

MARK ECKENWILER
Deputy Chief
Computer Crime and Intellectual
   Property Section

NATHAN JUDISH
Attorney, Computer Crime and
   Intellectual Property Section
Criminal Division
U.S. Department of Justice
1301 New York Avenue, NW
Washington, D.C. 20530
(202) 514-1026

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATEMENT OF INTEREST
OF THE UNITED STATES OF AMERICA ............................................................ 1

STATEMENT OF FACTS ................................................................................... 2

SUMMARY ....................................................................................................... 4

ARGUMENT ...................................................................................................... 6

I. THE PANEL'S DECISION MISREADS THE DEFINITION OF
"ELECTRONIC STORAGE" AND RENDERS SUPERFLUOUS
KEY PORTIONS OF THE STORED COMMUNICATIONS ACT . 6

    A. The Panel's Interpretation of "Electronic Storage"
    Contradicts the Plain Language of the Statute .......................... 6

    B. The Panel's Decision Threatens to Render Irrelevant
    Key Provisions of the Stored Communications Act ................. 9

        1. The Panel's Decision Renders Superfluous the
        Statutorily Defined Term "Electronic Storage" .............. 9

        2. The panel's broad interpretation of "electronic storage"
        renders § 2702(a)(2) and § 2703(b) largely superfluous,
        and this interpretation creates an unprecedented
        impediment to law enforcement .................................... 11

            i. Under the panel's broad interpretation of
            "electronic storage," § 2702(a)(2) and
            § 2703(b) serve no practical function in
            the Stored Communications Act ......................... 11

ii.    The distinction between communications
in "electronic storage" and other stored
communications is critical to law enforcement .. 14

II.    THE PANEL'S INTERPRETATION OF "ELECTRONIC
STORAGE" CONFLICTS WITH THE STORED
COMMUNICATIONS ACT'S LEGISLATIVE HISTORY ............ 18

CONCLUSION ................................................................................ 20

CERTIFICATE OF COMPLIANCE ................................................ 21

CERTIFICATE OF SERVICE ........................................................ 22

# TABLE OF AUTHORITIES

## CASES

In re Doubleclick Inc. Privacy Litigation, 154 F. Supp. 2d 497
(S.D.N.Y. 2001) ............................................................................ 14, 15

Fraser v. Nationwide Mutual Insurance Co., 135 F. Supp. 2d 623
(E.D. Pa. 2001) ................................................................................ 14

Jones v. United States, 529 U.S. 848 (2000) ................................................ 15

Theofel v. Farey-Jones, No. 02-15742 (9th Cir. Aug. 28, 2003) .................... passim

## STATUTES and RULES

Stored Communications Act, 18 U.S.C. §§ 2701-2712 ................................... passim

USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (2001) .................................. 19

18 U.S.C. § 2510(17) ....................................................................................... passim

18 U.S.C. § 2702 ............................................................................................. passim

18 U.S.C. § 2703 ............................................................................................. passim

18 U.S.C. § 2707 ................................................................................................. 15

18 U.S.C. § 2711(2) ............................................................................................ 11

Fed. R. App. P. 29 ................................................................................................. 1

## MISCELLANEOUS

H.R. Rep. No. 236(I), 107th Cong., 1st Sess. (2001) ............................................ 19

H.R. Rep. No. 647, 99th Cong., 2d Sess. (1986) ................................................ 8, 18

H.R. Rep. No. 932, 106th Cong., 2nd Sess. (2000) ............................................... 19

Orin S. Kerr, <u>A User's Guide to the Stored Communications Act-And A Legislator's Guide to Amending It,</u> Geo. Wash. L. Rev. (forthcoming 2004) ...... 15

<u>Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations</u> (2d ed. 2002) ................................................................. 15

## INTRODUCTION AND STATEMENT OF INTEREST
## OF THE UNITED STATES OF AMERICA

The United States of America files this brief pursuant to Fed. R. App. P. 29.

This case, Theofel v. Farey-Jones, No. 02-15742 (9th Cir. Aug. 28, 2003), involves the construction of the term "electronic storage," 18 U.S.C. § 2510(17), which plays a key role in the Stored Communications Act, 18 U.S.C. §§ 2701-2712 ("SCA"). The panel's conclusion — that e-mail messages remain in "electronic storage" regardless of whether they have been accessed by the addressee — is contrary to the SCA's language, structure, and legislative history. Moreover, the panel's unprecedented interpretation of "electronic storage" upends the statutory framework for law enforcement's ability to compel disclosure of stored communications from network service providers, such as ISPs.

The panel's decision in Theofel largely nullifies 18 U.S.C. § 2703(b), the statutory provision of the SCA that governs law enforcement access to electronic communications not in "electronic storage." Federal prosecutors in the Ninth Circuit have ceased using § 2703(b) to compel disclosure of stored communications as a result of Theofel. Moreover, because the Internet spans state and national borders, the panel's decision is likely to create difficulties for law enforcement nationwide. For example, some of the nation's largest e-mail service providers, including Hotmail and Yahoo!, are located in the Ninth Circuit.

Because such service providers must choose between compliance with § 2703(b) process issued elsewhere and adherence to the implications of Theofel, the panel's decision may upset criminal investigations across the United States.

In brief, because the panel's decision in this civil case has enormous implications in criminal law and procedure that the panel apparently did not recognize, the United States respectfully urges the court to grant the Petition for Rehearing and Suggestion for Rehearing En Banc of Defendant/Appellee Alwyn V. H. Farey-Jones (hereinafter "Petition for Rehearing").

## STATEMENT OF FACTS

Theofel arose out of a discovery dispute in a separate commercial litigation involving at least two of the plaintiffs in Theofel and defendant Farey-Jones. In this separate litigation, Farey-Jones and his counsel subpoenaed an ISP which provided e-mail service to a corporation associated with the Theofel plaintiffs. The subpoena contained no limits based on time or scope. In response to the subpoena, the ISP copied 339 e-mail messages to a web site, and the messages were reviewed by Farey-Jones and his counsel. A magistrate subsequently quashed the subpoena, finding it "massively overbroad" and "patently unlawful." See Slip op. at 12338-39.

2

Following the quashing of the subpoena, the plaintiffs (all of whom had their e-mail viewed by the defendants) brought the instant suit seeking damages under the SCA, other federal statutes, and various state laws. Section 2707 of the SCA provides for a civil action against violators of the SCA's provisions. The plaintiffs alleged that the defendants violated § 2701 of the SCA, which provides for criminal penalties for one who "intentionally accesses without authorization a facility through which an electronic communication service is provided . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701. The district court dismissed this claim.

The panel reversed. Only one issue addressed by the panel is of concern to the United States: whether the e-mail messages accessed by the defendants fell outside the scope of § 2701 because they were not "in electronic storage." Although the panel recognized that other courts have limited the definition of "electronic storage" to messages not yet delivered to their intended recipient, it asserted nevertheless that opened e-mails were "for purposes of backup protection" and thus fell within the scope of "electronic storage." Slip op. at 12345. The panel stated that "[a]n obvious purpose for storing a message on an ISP's server after delivery is to provide a second copy of the message in the event that the user needs

to download it again–if, for example, the message is accidentally erased from the user's own computer. The ISP copy of the message functions as a 'backup' for the user." Id. The panel concluded that "plaintiffs' e-mail messages were in electronic storage regardless of whether they had been previously delivered." Id. at 12346.

## SUMMARY

The Stored Communications Act, 18 U.S.C. §§ 2701-2712, sets forth a system of statutory privacy rights for customers and subscribers of computer network service providers. There are three main substantive components to this system, which serves to protect and regulate the privacy interests of network users with respect to government, network service providers, and the world at large. First, § 2703 regulates government access to stored communications. It creates a code of criminal procedure that federal and state law enforcement officers must follow to compel disclosure of stored communications. Second, § 2702 regulates voluntary disclosure by network service providers of customer communications and records, both to government and non-governmental entities. Third, § 2701 prohibits unlawful access to certain stored communications; anyone who obtains, alters, or prevents authorized access to those communications is subject to criminal penalties.

The structures of all three substantive components of the SCA reflect a series

4

of classifications indicating congressional judgments about what kinds of information implicate greater or lesser privacy interests. In general, the SCA offers greater privacy protection to categories of information perceived by the SCA's drafters to implicate greater privacy interests. In setting forth this series of classifications, the SCA relies on a few key terms which are explicitly defined by statute. These terms are used throughout the SCA; a court's interpretation of a term for purposes of one provision of the SCA has important ramifications for the SCA's other provisions. One such term is "electronic storage," defined by 18 U.S.C. § 2510(17). The United States' interest in Theofel is limited to the interpretation of the scope of "electronic storage."

The panel's interpretation of "electronic storage" ignores the plain language of the term's definition, in particular that the "backup" subsection § 2510(17)(B) refers to backups of "temporary, intermediate" communications protected by § 2510(17)(A). The panel also ignored legislative history confirming this interpretation. Moreover, the panel's interpretation upsets the structure of the SCA, including the balance between § 2703(a) and § 2703(b), and in the process creates an unprecedented impediment for law enforcement access to stored communications. Because of the importance of this result for criminal investigations nationwide, the court should grant the Petition for Rehearing.

## ARGUMENT

## I. THE PANEL'S DECISION MISREADS THE DEFINITION OF "ELECTRONIC STORAGE" AND RENDERS SUPERFLUOUS KEY PORTIONS OF THE STORED COMMUNICATIONS ACT

### A. The Panel's Interpretation of "Electronic Storage" Contradicts the Plain Language of the Statute

"Electronic storage" is defined by statute to mean "(A) any temporary, immediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). In Theofel, the panel held that "e-mail messages were in electronic storage regardless of whether they had been previously delivered." Slip op. at 12346. The panel did not dispute that delivered e-mail did not fit "within the purview of subsection (A)," because delivered e-mail is not in "temporary, intermediate" storage. Slip op. at 12345. However, the panel incorrectly held that delivered e-mail fell within the scope of § 2510(17)(B) because messages remain stored on the ISP as a "backup" for the user. Slip op. at 12345.

The holding that e-mail that has been delivered remains in "electronic storage" conflicts with the plain language of the Stored Communications Act ("SCA"). As an initial matter, the panel treated the "backup" subsection of the

6

definition (§ 2510(17)(B)) as independent of the "temporary, intermediate" subsection (§ 2510(17)(A)). The panel noted that "[a]n obvious purpose for storing a message on an ISP's server after delivery is to provide a second copy of the message in the event that the user needs to download it again–if, for example, the message is accidentally erased from the user's own computer." Slip op. at 12345. The panel concluded that storage of delivered e-mail fell "literally" within the scope of "electronic storage." Id. However, § 2510(17)(B) refers to "any storage of such communication by an electronic communication service for purposes of backup protection of such communication" (emphasis added). The phrase "such communication" necessarily refers to the communications defined in subsection § 2510(17)(A): communications stored temporarily at an intermediate point in transmission. **Therefore § 2510(17)(B) can encompass only backup copies of communications which are themselves in temporary, intermediate storage incidental to transmission.**

In support of its contrary conclusion, the panel mistakenly asserted that a narrow interpretation of "electronic storage" would render § 2510(17)(B) superfluous. See Slip op. at 12346. This erroneous claim is based on the assumption that under the narrow interpretation of "electronic storage," backups must also be temporary. The panel asserted that "Fraser's [narrow] interpretation

7

[of electronic storage] renders subsection (B) essentially superfluous, since temporary backup storage pending transmission would already seem to qualify as 'temporary, intermediate storage' within the meaning of subsection (A)." Slip op. at 12346 (emphasis added). However, under the plain language of § 2510(17)(B), the backup itself need not be temporary: what is essential is that the underlying communication be in temporary, intermediate storage. Thus, the panel grafted on an additional requirement (that backups be temporary) to the narrow meaning of § 2510(17)(B). Without this novel addition, § 2510(17)(B) is not superfluous under the narrow meaning of "electronic storage."

In this context, it is useful to consider what the term "backup" meant to the drafters of the SCA. In 1986, providers of electronic communication service commonly stored copies of files to protect against system failure. For example, the House Report on the SCA states that "[b]ack up protection preserves the integrity of the electronic communications system and to some extent preserves the property of users of such a system." H.R. Rep. No. 647, 99th Cong., 2d Sess., at 68 (1986). By including backup protections within the definition of "electronic storage," Congress ensured that backups would receive the same degree of protection as the underlying communications.

8

**B.      The Panel's Decision Threatens to Render Irrelevant Key Provisions of the Stored Communications Act**

The structure of the SCA further demonstrates that "electronic storage" should not be given the expansive definition provided by Theofel. First, the panel's broad reading of "electronic storage" would render that statutorily defined term itself superfluous throughout the SCA. Second, the panel's broad interpretation of "electronic storage" also renders § 2702(a)(2) and § 2703(b) largely superfluous.

**1.      The Panel's Decision Renders Superfluous the Statutorily Defined Term "Electronic Storage"**

Under Theofel, a backup falls within § 2510(17)(B) if it provides backup protection for either a user or a service provider. See Slip op. at 12345. Under this interpretation, any communication stored by an electronic communication service will be in "electronic storage." If a communication is in temporary, intermediate storage incident to transmission, it will fall under § 2510(17)(A). Any other copy of the communication stored by an electronic communication service will necessarily serve as a backup to either the user, the service, or both. Thus, any other copy will fall under § 2510(17)(B).

The defect in this reasoning is clear. If, as Theofel implies, any communication stored by an electronic communication service is in "electronic

9

storage," the term "electronic storage" becomes mere surplusage. In the SCA, the
term "electronic storage" appears only in the following locations:

- § 2701(a) prohibits unauthorized access "to a wire or electronic
  communication <u>while it is in electronic storage</u>" in an electronic
  communication service (emphasis added).

- § 2702(a)(1) prohibits a provider of electronic communication
  service to the public from disclosing "the contents of a
  communication <u>while in electronic storage</u>" (emphasis added).

- § 2703(a) sets rules under which the government may compel a
  provider of electronic communication service to disclose either
  (1) "the contents of a wire or electronic communication, that is
  <u>in electronic storage</u> in an electronic communications system for
  one hundred and eighty days or less" (emphasis added) or (2)
  "the contents of a wire or electronic communication that has
  been <u>in electronic storage</u> in an electronic communications
  system for more than one hundred and eighty days" (emphasis
  added).

In each of these sections, the underlined language is superfluous under the panel's
decision.

2. **The panel's broad interpretation of "electronic storage" renders § 2702(a)(2) and § 2703(b) largely superfluous, and this interpretation creates an unprecedented impediment to law enforcement**

Far more importantly, the panel's decision effectively obliterates the SCA's essential distinction between two categories of communications: (1) electronic communications in "electronic storage" in an "electronic communication service" and (2) electronic communications stored by a "remote computing service."[1] As explained below, under Theofel, the former would swallow the latter.

i. **Under the panel's broad interpretation of "electronic storage," § 2702(a)(2) and § 2703(b) serve no practical function in the Stored Communications Act**

The dichotomy between communications in "electronic storage" and those not in "electronic storage" permeates the SCA. In adopting an overbroad reading of this defined term, the panel effectively eliminated this distinction.

For example, § 2703, which controls government access to stored communications, provides greater protection to communications in "electronic storage" than to other stored communications. Section 2703(a) provides that "[a] government entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that

---

[1]   The term "remote computing service" is defined by 18 U.S.C. § 2711(2) as "provision to the public of computer storage or processing services by means of an electronic communications system."

11

is in electronic storage in an electronic communication system for one hundred and

eighty days or less, only pursuant to a warrant . . ." (emphasis added). Thus, law

enforcement can generally compel disclosures of e-mail "in electronic storage"

only upon a showing of probable cause.[2]

In contrast, § 2703(b)(1)(B) allows law enforcement to compel a provider of

"remote computing service" to disclose the contents of an electronic

communication by means of a subpoena or a court order under 18 U.S.C.

§ 2703(d).[3] Thus, prosecutors can obtain access to files stored with a remote

computing service using a standard lower than probable cause.[4]

This dichotomy between communications in "electronic storage" and other

communications is mirrored in the SCA's rules relating to voluntary (not

compulsory) disclosure of communications by network service providers. Under

§ 2702(a)(1), providers of electronic communication service are generally

---

[2] E-mail in "electronic storage" more than 180 days can be obtained by the government pursuant to a subpoena or 2703(d) order. See 18 U.S.C. § 2703(a) (stating that such communications can be compelled "by the means available under subsection (b) of this section").

[3] A 2703(d) order requires the government to offer "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

[4] Prosecutors retain the option of using a § 2703(a) search warrant to compel production of electronic communications stored by a remote computing service. See 18 U.S.C. § 2703(b)(1)(A).

prohibited from voluntarily disclosing user communications in "electronic storage." Providers of remote computing service – often the same entities – are prohibited by § 2702(a)(2) from voluntarily disclosing other user communications.

The communications governed by the precisely parallel non-"electronic storage" provisions, §§ 2702(a)(2) and 2703(b), are subject to additional (and identical) limitations. Each of these provisions applies explicitly to communications held by a service provider "solely for the purpose of providing storage or computer processing services to [the] subscriber or customer." § 2702(a)(2)(B); § 2703(b)(2)(B) (emphasis added). Plainly, communications within this category are **not** in "electronic storage," which is dealt with in parallel subsections (§§ 2702(a)(1) and 2703(a)), or these references to "providing storage ... to [the] subscriber" would be utterly superfluous. Yet the panel's decision declares that such convenience storage is a "backup" (and therefore within the meaning of "electronic storage"), abolishing a distinction written expressly into the Act. Such an interpretation renders largely superfluous § 2702(a)(2) and § 2703(b).

ii.   The distinction between communications in "electronic storage" and other stored communications is critical to law enforcement

The distinction between electronic communications in "electronic storage" and subject to the requirements of § 2703(a) and other electronic communications subject to § 2703(b) is critical for law enforcement, because § 2703 places greater restrictions on government access to communications in electronic storage. As traditionally understood by Congress, other courts, and the Department of Justice, the term "electronic storage" is much more limited than its everyday meaning. Under this traditional interpretation, "electronic storage" refers only to temporary storage, made in the course of transmission, by a provider of electronic communications service, and to backups of such intermediate communications. See Fraser v. Nationwide Mut. Ins. Co., 135 F. Supp.2d 623, 636 (E.D. Pa. 2001) (stating that "[t]he phrase 'for purposes of backup protection of such communication' in the statutory definition makes clear that messages that are in post-transmission storage, after transmission is complete, are not covered by part (B) of the definition of 'electronic storage'"); In re Doubleclick Inc. Privacy Litigation, 154 F. Supp.2d 497, 511-13 (S.D.N.Y. 2001) (emphasizing that "electronic storage" should have a narrow interpretation based on statutory

14

interpretation and legislative intent)[5]; <u>Searching and Seizing Computers and</u>

<u>Obtaining Electronic Evidence in Criminal Investigations</u> 86-87 (2d ed. 2002),

available at http:\\www.cybercrime.gov/s&smanual2002.pdf.

Under this narrow interpretation of "electronic storage," a copy of an e-mail

is in "electronic storage" only if it is at an intermediate point in its transmission

and has not yet been sent on to its final destination, the recipient of the e-mail. If

an e-mail has been received by a recipient's ISP but has not yet been accessed by

the recipient, it is in "electronic storage." Once the recipient retrieves the e-mail,

however, the communication reaches its final destination. If the recipient chooses

to retain a copy of the e-mail on the ISP's system, the copy on the network is no

longer in "electronic storage" because it is no longer in "temporary, intermediate

storage . . . incidental to . . . electronic transmission." <u>See</u> Orin S. Kerr, <u>A User's</u>

<u>Guide to the Stored Communications Act–And A Legislator's Guide to Amending</u>

<u>It</u>, Geo. Wash. L. Rev. (forthcoming 2004), available at

http:\\papers.ssrn.com/sol3/papers.cfm?abstract_id=421860, at 7-8 (draft).

---

[5]    In interpreting the term "electronic storage" narrowly, the <u>Doubleclick</u> court also relied upon the canon of statutory interpretation which disfavors a broad reading of a criminal statute. <u>See Doubleclick</u>, 154 F. Supp.2d at 513. That rule is equally applicable to <u>Theofel</u>. Although <u>Theofel</u> is a civil suit under § 2707 of the SCA, civil liability under § 2707 for a violation of § 2701 is coextensive with criminal liability under § 2701. Because <u>Theofel</u> reads "electronic storage" expansively, it also reads criminal liability under § 2701 expansively, contrary to the canons of statutory interpretation. <u>See Jones v. United States</u>, 529 U.S. 848, 858 (2000).

Even under this traditional interpretation of "electronic storage," opened and retained e-mail stored with an ISP is not without protection under the SCA. However, its categorization under the SCA changes once a copy is delivered to its intended recipient, and it receives somewhat less privacy protection. Such e-mail retained on the provider's system is no longer an "electronic communication . . . in electronic storage;" instead, it becomes an electronic communication stored by a "remote computing service." See id.

Combining the structure of § 2703(a) and (b) with the traditional interpretation of the status of e-mail under the SCA yields the following framework for compelling disclosure of e-mail, which until now has been followed by federal prosecutors nationwide:

- Unopened e-mail stored on an ISP's servers constitutes electronic communications in electronic storage. Such e-mail can be obtained only using a warrant based on probable cause, unless it is more than 180 days old.

- Opened e-mail or copies of sent e-mail retained by users constitute files stored with a remote computing service. Such files can be obtained pursuant to § 2703(b)(1)(B) using a subpoena or 2703(d) order, or pursuant to § 2703(b)(1)(A) using

a warrant based on probable cause.

Theofel overturns this framework. Under Theofel, all copies of e-mail stored by a network services provider constitute electronic communications in electronic storage and hence are available to law enforcement only pursuant to a warrant based on probable cause, unless they are more than 180 days old. Substantial quantities of evidence previously available to state and federal prosecutors are no longer available under this heightened standard. Such evidence is often critical in a broad spectrum of cases, including cases involving network intrusion, fraud, child pornography, and illegal drugs. The significance of this change for law enforcement cannot be overstated.

In addition, because the Internet spans state borders, Theofel is likely to create conflicts for law enforcement nationwide. Network service providers who violate the SCA are subject to civil suit under § 2707. They may face civil suits in the Ninth Circuit for responding to government process under § 2703(b) from outside the Ninth Circuit. Such suits are particularly likely to be a problem for service providers located in the Ninth Circuit, like Hotmail and Yahoo!. Alternatively, network service providers outside the Ninth Circuit may fear lawsuits brought by customers within the Ninth Circuit. Network service providers may begin to resist subpoenas and 2703(d) orders under § 2703(b), even when that

process does not come from the Ninth Circuit. Thus, <u>Theofel</u> will likely prove

disruptive for law enforcement nationwide.

## II. THE PANEL'S INTERPRETATION OF "ELECTRONIC STORAGE" CONFLICTS WITH THE STORED COMMUNICATIONS ACT'S LEGISLATIVE HISTORY

The error in the panel's holding – that e-mail is in "electronic storage"

regardless of whether it has been delivered – is further confirmed by the SCA's

legislative history. As explained below, Congress intended a much narrower

reading of "electronic storage." For that reason, the Petition for Rehearing should

be granted.

In the course of considering the SCA's prohibitions on voluntary disclosure

by network service providers of customer communications, the drafters of the

SCA in 1986 explicitly considered what would happen when a recipient of e-mail

kept a copy of the e-mail on his ISP after receipt:

> Sometimes the addressee, having requested and received a message, chooses to leave it in storage on the service for re-access at a later time. The Committee intends that, in leaving the message in storage, the addressee should be considered the subscriber or user from whom the system received the communication for storage, and that such communication should continue to be covered by section 2702(a)(2).

H.R. Rep. No. 647, 99th Cong., 2nd Sess., at 65 (1986) (emphasis added). As

explained above, § 2702(a)(2) prohibits disclosure of communications stored by a

remote computing service, rather than communications in "electronic storage" in

18

an electronic communication service (which are covered by § 2702(a)(1)). The House Report in effect says the following: when a customer opens an e-mail message and leaves a copy on the ISP server, the copy is treated as a communication maintained by a remote computing service.

Subsequent legislative history confirms Congress's continued understanding that previously delivered e-mail maintained by an ISP is not in electronic storage. In 2000, Congress considered and rejected amending the definition of electronic storage to include "any storage of an electronic communication by an electronic communication service without regard to whether the communication has been accessed by the intended recipient." See H.R. Rep. No. 932, 106th Cong., 2nd Sess. at 7 (2000) (emphasis added). The drafters of this amendment understood that previously accessed e-mail did not fall within the scope of § 2510(17).

In addition, the House Report on the USA Patriot Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), demonstrated Congress's narrow understanding of the term "electronic storage." In the course of discussing an amendment to the SCA allowing for nationwide service of § 2703(a) warrants, the Report states that "2703(a) requires a search warrant to compel service providers to disclose unopened e-mails." H.R. Rep. No. 236(I), 107th Cong., 1st Sess. at 57 (2001) (emphasis added). Because warrants under § 2703(a) are required only for

19

electronic communications in "electronic storage," this statement is further evidence that Congress did not intend opened e-mail to fall within the scope of "electronic storage." The panel has supplied the term "electronic storage" with a meaning rejected by Congress, thereby creating difficulties for law enforcement. Therefore, the Petition for Rehearing should be granted.

## CONCLUSION

For the foregoing reasons, this Court should grant the Petition for Rehearing.

Respectfully submitted.

CHRISTOPHER A. WRAY
Assistant Attorney General

MARK ECKENWILER
Deputy Chief
Computer Crime and Intellectual
   Property Section

NATHAN JUDISH
Attorney, Computer Crime and
   Intellectual Property Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530

# CERTIFICATE OF COMPLIANCE

I certify that pursuant to Circuit Rules 35-4 and 40-1 the attached Brief for the United States as Amicus Curiae Supporting Defendant/Appellee's Petition for Rehearing and Suggestion for Rehearing En Banc is proportionately spaced, has a typeface of 14 points, and contains 4136 words as counted by the word processing system on which it was prepared.

Mark Eckenwiler

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that two copies of the foregoing Brief for the United States as Amicus Curiae Supporting Defendant/Appellee's Petition for Rehearing and Suggestion for Rehearing En Banc were this day sent by regular mail to the following person(s):

Robert E White
Susan C. Rushakoff
Law Offices of Robert E. White
177 Post Street, Suite 890
San Francisco, CA 94108

James M. Wagstaffe
Pamela Urueta
Kerr & Wagstaffe LLP
100 Spear Street, Suite 1800
San Francisco, CA 94105

Richard Idell
Jennifer Marone
Idell, Berman & Seitel
530 Bush Street, Suite 601
San Francisco, CA 94105

Iryna A. Kwasny
Environmental Law Foundation
1736 Franklin Street, 9th Floor
Oakland, CA 94612

MARK ECKENWILER
Deputy Chief
U.S. Department of Justice
Criminal Division
Computer Crime and Intellectual
Property Section
1301 New York Avenue, NW
Suite 600
Washington, D.C. 20530
(202) 514-1026

Dated: SEPTEMBER 25, 2003

22